IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ODALIZ ORTEGA, | ) | CASE NO. 1:20CV1461 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Odaliz Ortega ("Ortega") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2(b)(1).

As set forth more fully below, the Administrative Law Judge erred because she failed to properly evaluate Ortega's right shoulder impairment and whether a cane is medically necessary. Accordingly, undersigned recommends that the Court **REVERSE** and **REMAND** the Commissioner's decision is for further proceedings consistent with this opinion.

## I. Procedural History

Ortega filed applications for DIB and SSI in December 2017, alleging a disability onset date of March 30, 2017. Tr. 191, 198. She alleged disability based on the following: sciatic pain, fibromyalgia, depression, and arthritis. Tr. 216. After denials by the state agency initially (Tr. 73, 74) and on reconsideration (Tr. 103, 104), Ortega requested an administrative hearing.

1

Tr. 150.  A hearing was held before an Administrative Law Judge ("ALJ") on February 14, 2019.

Tr. 37-72.  In her May 1, 2019, decision (Tr. 15-32), the ALJ determined that Ortega can

perform her past relevant work, i.e., she is not disabled.  Tr. 29-32.  Ortega requested review of

the ALJ's decision by the Appeals Council (Tr. 188) and, on May 7, 2020, the Appeals Council

denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A.  Personal and Vocational Evidence

Ortega was born in 1967 and was 49 years old on her alleged onset date.  Tr. 191.  She

completed the 12th grade.  Tr. 40.  She previously worked as a hand packager, food sales clerk,

housekeeping cleaner, home health aide, nurse aide, babysitter, and design printer.  Tr. 64-65.

### B.  Relevant Medical Evidence

On May 12, 2017, Ortega followed up with Mr. Markowski, CNP, at pain management

for her lumbar pain. Tr. 435.  Markowski noted prior x-ray results: degenerative changes of her

lumbar spine, disc space narrowing at L3-4 with marginal osteophytes at all levels, maintained

facet joints, no acute fracture or abnormal subluxation, intact pedicles and sacroiliac joints with

some sclerosis of the sacroiliac joint, and degenerative changes of the visualized lower thoracic

spine.  Tr. 436.  Upon exam, she was alert, in no distress, and cooperative; her neck was normal

and supple; her back was symmetric with no abnormal curvature; she displayed tenderness to

palpation in her left lumbar spine with a positive sit slump test to the left and tenderness to

palpation in her left SI joint; she had 5/5 musculoskeletal strength in all her extremities; her

reflexes were +2; and she had positive vibratory sensation in all her extremities.   Tr. 437.

Markowski assessed that Ortega remained stable on her current medication regimen and that her

medications reduced her pain to an acceptable level and allowed her to remain functional with

her daily activities.  Tr. 438.

On May 15, 2017, Ortega had surgery on her right thumb performed by Dr. Bafus, M.D., due to carpometacarpal arthritis.  Tr. 427.  Dr. Bafus noted that she had seen Ortega for many years for her right thumb arthritis, she was a laborer, and that she had previously had multiple injections.  Tr. 427.

On October 24, 2017, Ortega saw a nurse practitioner at her family practice and requested a referral to pain management and podiatry.  Tr. 279.  She had pain on the back side of her left foot and reported 3 to 4 falls the past few months due to a weak right knee.  Tr. 279.  She was attending physical therapy.  Tr. 279.

On November 10, 2017, Ortega saw licensed social worker Ms. Carver for a behavioral health follow up after having been diagnosed with moderate single current episode of major depressive disorder, insomnia, and psychological trauma stemming from a recent visit to Puerto Rico to help family after the hurricane.  Tr. 275-278.

On November 20, 2017, Ortega saw Dr. Malkamaki, M.D., in physical medicine and rehabilitation for a disability evaluation.  Tr. 366.  She was noted to be a fall risk due to her use of a cane.  Tr. 366.  Ortega reported her history and current pain in her lumbar area, left leg, and right hand.  Tr. 366.  Upon exam, she had full strength, including in her right hand, a normal gait, maximal tenderness to palpation over her lumber sacral area, mostly on the left, with mild paraspinal hypertonicity, and a limited range of motion in her lumbar spine and right hand.  Tr. 369.  Dr. Malkamaki's impression was lumbar discogenic pain with some early spinal stenosis and clinical evidence of left lower extremity pain plus fibromyalgia, right hand status post-surgery, and depression.  Tr. 369.  He concluded that she may be able to improve her function and maintain at least a sedentary level job.  Tr. 369.

On January 10, 2018, Ortega saw Nurse Markowski for a follow up, reporting she had fallen 10 days prior. Tr. 516-517.

On March 7, 2018, Ortega saw Dr. Bafus for a follow up for right shoulder and right wrist pain for the past three weeks. Tr. 785. Dr. Bafus reviewed her x-rays and stated that her right shoulder pain was consistent with rotator cuff pathology and right de Quervain tenosynovitis. Tr. 786.

On March 29, 2018, Ortega saw a certified nurse practitioner at Neighborhood Family Practice and requested a four-prong cane due to increased falls and instability from her left leg giving out. Tr. 899-900. Upon exam, she had decreased mobility, an abnormal gait due to pain, and positive bilateral straight leg raise testing. Tr. 902. She had tenderness in her lumbar area, normal reflexes and sensation, and a normal mood, affect and behavior. Tr. 902. She was provided a referral for a four-pronged cane. Tr. 902.

On May 8, 2018, Ortega had a pain management visit and reported that her medication was improving her activities of daily living. Tr. 819. She was noted to be at risk for falls. Tr. 819. She was referred to physical therapy. Tr. 820.

On June 25, 2018, Ortega attended physical therapy for her low back and left leg pain. Tr. 578. She reported needing help with lower extremity dressing, groceries, and cleaning. Tr. 578. Upon exam, she had an antalgic gait with decreased left stance time and using a narrow-based quad cane. Tr. 580. She had slow, decreased trunk rotation, decreased arm swing, and a flexed trunk. Tr. 580. She was observed to have arrived holding the cane in her left hand, rather than the appropriate right hand, because she was unable to hold it in her right hand. Tr. 601. At her second visit on July 18, she reported that she had had three falls in the past six months. Tr. 599.

On July 21, 2018, Ortega visited the ortho hand department at MetroHealth for a follow up after having a shoulder MRI.  Tr. 608.  The MRI showed some tendinosis of the supraspinatus.  Tr. 609.  She was referred to pain management and rehab.  Tr. 609.

On November 20, 2018, Ortega completed her last of eight physical therapy sessions for her low back and left extremity pain with no significant change in her symptoms.  Tr. 732, 735.  On December 4, she started physical therapy for her right shoulder rotator cuff tendonitis.  Tr. 740.

On August 29, 2018, Ortega saw Dr. Cleland, D.O., at MetroHealth orthopedics clinic for right shoulder pain.  Tr. 627.  Dr. Cleland commented that she was on medication, followed pain management, and that her treatment was complicated by chronic opioid use, depression, and anxiety.  Tr. 632.  Dr. Cleland gave her a steroid/cortisone injection and referred her to physical therapy.  Tr. 635.  At a follow up on September 12, she reported that her shoulder pain had improved 30% and that she still had some thumb pain.  Tr. 639.

On September 12, 2018, Ortega went to the emergency room for a sudden onset of bilateral low back pain radiating down her left leg upon getting out of bed that morning.  Tr. 651.  She was treated with valium, which helped; diagnosed with a back sprain; and discharged.  Tr. 653.

On December 18, 2018, Ortega returned to pain management.  Tr. 748.  She was stable on her current medications and referred for a lumbar injection.  Tr. 753.

### C. Opinion Evidence

### 1. Treating Source

On February 14, 2019, Dr. Malkamaki completed a Medical Source Statement on Ortega's behalf.  Tr. 924-927.  He had seen her for 2 visits to complete her paperwork.  Her

diagnoses were lumbar discogenic pain with possible early spinal stenosis, lower extremity referred pain, right shoulder tendonitis, and right wrist fusion.  Her symptoms were daily pain in her low back, moderately severe pain in her legs, greater in her left, which increased with bending, standing and walking, and shoulder pain and weakness.  Clinical findings included a decreased lumbar range of motion, normal neuro exam, and mild shoulder impingement but normal range of motion.  He opined that Ortega could sit from 15 to 120 minutes and stand 5 to 10 minutes; sit at least 6 hours and stand/walk about 2 hours; and lift less than 10 pounds occasionally and 10 pounds rarely.  She had limitations with grasping and reaching in front and overhead.  She would need a sit/stand option; she would need to walk every hour for 5-10 minutes.  She did not need to take unscheduled breaks or elevate her legs and she would not be off task for any portion of the workday.  She did not have to use a cane but it was "Ok if she does" to improve her base of support.  She was capable of "moderate stress—normal work."  Dr. Malkamaki explained that an at will sit to stand option would allow Ortega to work at a light to sedentary work level based on the above restrictions.

**2. State Agency Reviewing Physicians**

On January 3, 2018, Dr. Manos, M.D., reviewed Ortega's record and opined that she was limited to performing light level exertional work, had postural limitations, should avoid all exposure to hazards, and could frequently handle with her right extremity due to her right hand impairment.  Tr. 81-84.  On February 21, 2018, Dr. Siddiqui, M.D., adopted Dr. Manos' findings.  Tr. 112-114.

On January 3, 2018, Dr. Kirwin, Ph.D., reviewed Ortega's record and opined that she was capable of maintaining attention and concentration for 1-4 step tasks consistently and 5-6 step tasks occasionally with no high pace or high production quotas and she should be exposed to

changes gradually and in advance.  Tr. 98-100.  On February 20, 2018, Dr. Murry-Hoffman, Ph.D., adopted Dr. Kirwin's findings.  Tr. 129-131.

### D.  Testimonial Evidence

#### 1. Ortega's Testimony

Ortega was represented by counsel and testified at the administrative hearing.  She testified that she has a driver's license and is able to drive.  Tr. 40.  She lives with her adult son, who is mentally disabled and mostly non-verbal.  Tr. 57-58.

At the hearing, Ortega had a wheeled walker and wore a splint on her right hand for her thumb.  Tr. 41.  She started using a wheeled walker "probably around last year."  Tr. 46. Initially she used a single pointed cane because she had started "wobbling": she was tripping and falling.  Tr. 46.  She was told she was falling because of sciatica.  Tr. 46.  Next she used a quad cane and then she used a wheeled walker, which helped her fall less.  Tr. 47.  She still falls when she goes down the stairs; she can't use the walker on the stairs and she has to go down them one at a time.  Tr. 47.

At her last job, she was having problems and had not noticed that her thumb was dislocated.  Tr. 47-48.  She didn't want to go to the doctor because she needed to work.  Tr. 48. Also, she had to stand most of the day taking care of customers and that caused her back to hurt. Tr. 48.  She cannot sit or stand for more than a certain period of time.  Tr. 48.  She also has problems with her right shoulder.  Tr. 49.  She has inflammation from using her hand a lot.  Tr. 49.  The day after the hearing she is scheduled for right shoulder surgery.  Tr. 49.  She cannot raise her right arm above a certain level, about half-way up, and she moves her whole body if she needs to use her arm.  Tr. 50.  This has been going on for a little more than one year.  Tr. 50. She has no trouble reaching in front of her, but she can't reach above or over her hip.  Tr. 50.

She had had an injection in her right shoulder but it did not really help.  Tr. 51.  She also had injections in her back and both hands.  Tr. 51.

The prior year, Ortega took a trip to New York City because her uncle had died and her family was there.  Tr. 51.  She walked around the city a bit with her walker.  Tr. 51.  At home, she leaves her house mostly for doctor appointments.  Tr. 62.  She gets along with other people except for confrontations with others when she is defending her son.  Tr. 62-63.

Ortega has done physical therapy but it caused more pain.  Tr. 52.  At first her visits were twice a week and then she went once a week.  Tr. 53.  She is still doing physical therapy.  Tr. 53.

Ortega described the difficulty she has with her right hand.  Tr. 53.  She stated that she has no grip.  Tr. 53.  She has difficulty using her hand around the house and relies on devices to open cans and bottles.  Tr. 53.  She has difficulty dressing herself, but a friend is at her house most of the time and helps her.  Tr. 54.  For instance, she is unable to tie her shoes.  Tr. 54.  At the hearing she was wearing flip-flops, which she also has to wear because her legs swell.  Tr. 54.  She had had carpal tunnel surgery on her left hand in 2014 and she gets injections.  Tr. 55.  Her left hand hurts but it has more grip than her right hand and she is forced to rely on it.  Tr. 55.

Ortega takes medication and goes to counseling for depression.  Tr. 56.  She does not receive help from family members.  Tr. 57.  She sees shadows and hears voices and senses that people are touching her.  Tr. 58, 61.  Her counselor is working hard to help her and she is working hard and has developed some coping skills.  Tr. 58-59.  Her medication is helping with hearing voices; she does not hear them as often.  Tr. 63.  She thought that a red car had been following her for over a year.  Tr. 59.  She drove less so she wouldn't have to see it.  Tr. 60.  Her attention and concentration are impaired.  Tr. 61.  She could watch a 30 or 60 minute television show and remember what it was about.  Tr. 61.  She used to read for enjoyment but no longer

does because she can't remember what she read. Tr. 61-62.

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. The ALJ discussed with the VE Ortega's past work. Tr. 64-65. The ALJ asked the VE to determine whether a hypothetical individual of Ortega's age, education, and work experience could perform her past work or any other work if that person had the limitations subsequently assessed in the ALJ's RFC determination, described below. The VE answered that such an individual could perform Ortega's past work of housekeeper and food sales clerk and the following, additional jobs that exist in significant numbers in the national economy: merchandise marker, mailroom clerk, and sales attendant. Tr. 65-66.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.      If claimant is doing substantial gainful activity, he is not disabled.

2.      If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her May 1, 2019, decision, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.  Tr. 17.

2.      The claimant has not engaged in substantial gainful activity since March 30, 2017, the alleged onset date.  Tr. 17.

---

[1] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

3.      The claimant has the following severe impairments: status post right thumb surgery/carpometacarpal ("CMC") arthrodesis and distal radial bone graft, arthritis/osteoarthritis of the right hand CMC joint, degenerative (lumbar) disc disease, degenerative acromioclavicular ("AC") joint in the right shoulder, major depressive disorder, and adjustment disorder with depressed mood.  Tr. 18.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 20.

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can frequently handle on the right.  The claimant can frequently stoop, kneel, balance, and crouch.  The claimant can occasionally climb ramps and stairs, as well as crawl.  The claimant can never climb ladders, ropes and scaffolds. The claimant should never be exposed to unprotected heights, dangerous moving mechanical parts, or operate a motor vehicle.  The claimant should not perform tasks that require high pace or high production quotas.  The claimant can occasionally tolerate changes in a routine work setting, but those changes should be explained in advance and introduced gradually.  Tr. 23.

6.      The claimant is capable of performing past relevant work as a food sales clerk and housekeeping cleaner.  These past relevant work [sic] do not require the performance of work-related activities precluded by the claimant's residual functional capacity.  Tr. 29.

7.      The claimant has not been under a disability, as defined in the Social Security Act, from March 30, 2017, through the date of this decision.  Tr. 32.

## V. Plaintiff's Arguments

Ortega argues that the ALJ failed to properly evaluate the totality of the evidence in the record and erred when she found that Ortega could perform her past relevant work.  Doc. 16, 19.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

### A. The ALJ erred with respect to Ortega's shoulder impairment

Ortega challenges the ALJ's decision with respect to her shoulder impairment. Doc. 16, pp. 11-19; Doc. 19, pp. 1-2. Specifically, she asserts that the ALJ erred when she found her shoulder impairment to be "not severe" at step two and then failed to consider her limitations stemming from that impairment in her RFC assessment. Doc. 16, pp. 11-12; Doc. 19, pp. 1-2. The undersigned agrees.

At step 2, the ALJ found that Ortega's "degenerative acromioclavicular ("AC") joint in the right shoulder" was a "severe" impairment. Tr. 18. Confusingly, the ALJ also found Ortega's "chronic right shoulder pain" to be a "non-severe" impairment. Tr. 18. It is not clear whether the ALJ made a scrivener's error or whether the ALJ intended to divide Ortega's right shoulder impairment into two distinct impairments. If the former, it is unknowable whether the ALJ meant to find Ortega's shoulder impairment to be severe or not severe. If the latter, the ALJ did not provide an explanation for why she found Ortega's "chronic right shoulder pain" to be a non-severe impairment. In her discussion of Ortega's "non-severe" chronic right shoulder pain, the ALJ remarked that Ortega's MRI showed mild thickness and increased signal intensity of the supraspinatus and her exam findings indicated "a fair amount of pain behavior," and that Ortega

had decreased range of motion, strength, flexibility, and functioning in December 2018.  Tr. 18-19.  Yet the ALJ provided no conclusion as to why she found that that amounts to "a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007).

An error at step two is harmless so long as the ALJ is able to consider the claimant's non-severe impairment when assessing the RFC.  *See Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).  But when the ALJ fails to consider the claimant's non-severe impairment when assessing the RFC, a step two error is not harmless.  *See Tuck v. Astrue*, WL 474411, at *8 (W.D. Ky. Feb. 19, 2008) (distinguishing *Maziarz* because "the record is not sufficiently developed [in this case] to determine whether at the fourth and fifth steps plaintiff has been prejudiced by the ALJ's error at the second step."); *Jamison v. Comm'r of Soc. Sec.*, 2008 WL 2795740, at *9 (S.D. Ohio July 18, 2008) ("*Maziarz* is distinguishable from the instant case because it is not clear that the ALJ considered plaintiff's cardiac impairment at the other steps of the sequential evaluation process."); *Hart v. Comm'r of Soc. Sec.*, 2016 WL 6997906, at *4 (W.D. Mich. Nov. 30, 2016) ("[T]he record does not reflect that the ALJ considered the limitations and restrictions imposed by all of Plaintiff's impairments.  The ALJ's [step 2] error here, therefore, is not harmless.").

Here, the ALJ did not evaluate Ortega's right shoulder impairment when formulating her RFC.  The ALJ did not discuss Ortega's shoulder impairment at step three.  Tr. 20-21.  At step four, the ALJ assessed an RFC that did not accommodate her shoulder impairment.[2]  Tr. 23.  In explaining her RFC assessment, the ALJ discussed Ortega's testimony wherein Ortega stated

---

[2]  The ALJ limited Ortega to light work, i.e., lifting and carrying 10 pounds frequently and 20 pounds occasionally and frequent handling on the right.  The handling limitation appears to stem from Ortega's right hand impairment.  If the ALJ intended those limitations to also accommodate her right shoulder impairment, she did not say so.  The state agency reviewers' opinions, which the ALJ found persuasive, opined that the above limitations were due to Ortega's right hand, obesity, and lumbar degenerative disc disease.  E.g., Tr. 127.  They did not appear to consider Ortega's right shoulder impairment.

that she has problems using her right arm and difficulty reaching above or overhead due to her shoulder impairment.  Tr. 24.  But the ALJ did not provide a conclusion regarding that testimony, i.e., she did not explain why she apparently discounted it.

In recounting the medical evidence to explain the RFC, the ALJ headlined a section of her decision: "Right Thumb Surgery, Right AC Degenerative Changes, Arthritis/Osteoarthritis." Tr. 25.  But the ALJ did not discuss Ortega's AC joint or right shoulder in the paragraphs under that subheading.  Tr. 25.  Rather, the ALJ only discussed Ortega's right hand arthritis, hand surgery, and resultant right wrist problems.  The ALJ mentioned Ortega's right shoulder just once at step four, when she referenced Ortega's "mild shoulder problems" when discussing Dr. Malkamaki's opinion.  Tr. 29.  One passing reference to Ortega's right shoulder impairment is not sufficient.  Simply put, the ALJ did not provide any explanation regarding her conclusion about the limiting effects, if any, of Ortega's right shoulder impairment.  And as detailed above, there is evidence in the record that could support a limitation regarding Ortega's right shoulder. The ALJ's failure to explain her evaluation of Ortega's severe and non-severe right shoulder impairment is not harmless error.  *Hart*, 2016 WL 6997906, at *4

Defendant argues that substantial evidence in the record indicates that Ortega's shoulder impairment, "and her condition in general, did not cause[] additional limitations on her ability to work, particularly for any consecutive twelve-month period."  Doc. 18, p. 10.  To the extent Defendant asserts that Ortega's shoulder impairment did not last or was not likely to last for a consecutive 12-month period, that assertion is directly contradicted by the ALJ's express finding that Ortega's shoulder impairment would have more than a minimal effect on her ability to perform basic work activities for a continuous 12-month period.  Tr. 18.  Moreover, Defendant's citations to the record do not remedy the lack of record citation and analysis in the ALJ's

decision. *Hankinson v. Comm'r of Soc. Sec.*, 2019 WL 6695821, at *4 (S.D. Ohio Dec. 9, 2019)[3] ("[T]he Court cannot evaluate the ALJ's reasoning and accepting the Commissioner's attempt to explain this omission would result in the Court 'engaging in post hoc rationalization, which is prohibited.'" (collecting cases)).

In sum, the ALJ erred at step two when she found that Ortega's "shoulder pain" was not severe and then failed to evaluate that impairment when formulating her RFC. And the ALJ erred because she found that Ortega's "degenerative AC joint" was a severe impairment, but, likewise, did not evaluate that impairment when formulating her RFC. Accordingly, the ALJ's decision should be remanded for consideration of Ortega's right shoulder impairment. *See White v. Comm'r of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009) (reversing because the ALJ did not consider the claimant's combined severe and non-severe impairments when formulating the RFC; "Once one severe impairment is found, the combined effect of all impairments must be considered, even if other impairments would not be severe." (citing 20 C.F.R. §§ 404.1523, 404.1545(a)(2)).

**B. The ALJ erred with respect to Ortega's use of an assistive device**

Ortega argues that the ALJ erred when she failed to consider evidence that Ortega had been prescribed a quad cane and failed to properly evaluate whether a cane was medically necessary. Doc. 16, p. 14-23; Doc. 19, p. 2. The undersigned agrees.

"[T]he Sixth Circuit has held that if a cane is not a necessary device for the claimant's use, it cannot be considered a restriction or limitation on the plaintiff's ability to work." *Murphy v. Astrue*, 2013 WL 829316, at *10 (M.D.Tenn. March 6, 2013) (citing *Carreon v. Massanari*, 51 Fed. App'x 571, 575 (6th Cir. 2002)); *Cruz-Ridol Carreon v. Comm'r of Soc. Sec.*, 2018 WL 1136119, at *15 (N.D.Ohio Feb. 12, 2018), *report and recommendation adopted*, 2018 WL

---

[3] Report and recommendation adopted, 2020 WL 240812 (S.D. Ohio Jan. 16, 2020).

1083252.  To be considered a restriction or limitation, a cane "must be so necessary that it would trigger an obligation on the part of the Agency to conclude that the cane is medically necessary," i.e., the record must reflect "more than just a subjective desire on the part of the plaintiff as to the use of a cane."  *Murphy*, 2013 WL 829316, at *10 (internal citations omitted).  "If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE."  *Id*.  Generally, an ALJ's finding that a cane or other assistive device is not medically necessary is error when the claimant has been prescribed an assistive device and the ALJ did not include the use of the device in the RFC assessment without providing an explanation for the omission.  *Cruz-Ridolfi*, 2018 WL 1136119, at *15 (quoting *Watkins v. Comm'r of Soc. Sec.*, 2017 WL 6419350, at *11 (N.D. Ohio Nov. 22, 2017), *report and recommendation adopted*, 2017 WL 6389607); SSR 96-9P, 1996 WL 374185 (July 2, 1996) ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)").

Here, Ortega was prescribed a quad cane.  Tr. 902.  The ALJ acknowledged the fact that Ortega used an assistive device but did not acknowledge the fact that a quad cane had been prescribed.  Therefore, it is not clear whether she considered the fact that a quad cane had been prescribed when evaluating Ortega's need for a cane.  The undersigned notes that Ortega's quad cane was prescribed in March 2018 and that the state agency reviewing physicians' opinions (upon which the ALJ largely relied) were generated before then (in January and February 2018), so they did not consider her quad cane prescription.

The ALJ detailed record evidence showing that Ortega had a steady gait and full strength. Tr. 25-27.  But she also detailed record evidence showing that Ortega had an antalgic gait and decreased strength.  Tr. 25-27.  Despite detailing this inconsistent evidence, the ALJ did not provide any analysis or conclusion that she drew from that evidence.[4]  Therefore, it is not clear from the ALJ's decision why she found that Ortega did not require the use of an assistive device. Defendant's interpretation of the evidence leading to his conclusion that Ortega did not require a cane (Doc. 18, p. 11) does not remedy the ALJ's failure to consider the evidence and arrive at a reasoned conclusion.

At step five of the decision the ALJ noted that, at the hearing, Ortega's counsel had asked the VE a question about the use of an assistive device.  Tr. 31.  The ALJ then stated that she found Dr. Malkamaki's opinion that Ortega did not need an assistive device to be persuasive.  Tr. 31.  That finding is problematic for a few reasons.  First, as discussed above, the ALJ did not acknowledge that Ortega had been prescribed a quad cane, so it is not clear why she credited Dr. Malkamaki's opinion over evidence of a prescribed quad cane.  Second, although Dr. Malkamaki opined that Ortega did not need a cane, the ALJ acknowledged that Dr. Malkamaki also opined that she was limited to "less than sedentary exertional work." Tr. 29.  The fact that Dr. Malkamaki opined that Ortega did not need a cane while standing/walking for 5 to 10 minutes at a time for a total of 2 hours a workday and lifting/carrying no more than 10 pounds is not evidence that Ortega did not need a cane while performing work the ALJ found she could do: standing and walking up to 6 hours a day and lifting/carrying up to 20 pounds.

Finally, the ALJ had earlier discredited all notable portions of Dr. Malkamaki's opinion. Tr. 28.  She provided no explanation for why she credited his one opinion regarding the use of an

---

[4] The undersigned notes that the ALJ commented that Ortega's records "indicated that she did not complete her physical therapy" in October 2018.  Tr. 27.  The treatment note the ALJ cites (6F/50) is from Ortega's third out of eight physical therapy visits, and she completed her physical therapy in November.  See Tr. 732, 735.

assistive device while rejecting the balance of his opinion.  In sum, the ALJ's determination that an assistive device was not medically necessary is insufficient, and remand is necessary for the ALJ to consider this issue.

### C. On remand, the ALJ will have an opportunity to reconsider Ortega's mental impairments

Ortega argues that the ALJ erred at step three when she found that Ortega's impairments did not meet or equal Listing 12.04, depressive, bipolar and related disorders.  Doc. 16, pp. 16-19.  She complains that the ALJ failed to consider all of her symptoms when erroneously concluding that Ortega had moderate or mild limitations in each of the paragraph "B" criteria. Doc. 16, pp. 16-18.  Specifically, Ortega submits that the ALJ acknowledged that she had memory problems but disregarded them and that she did not adequately account for her hallucinations.  On remand, the ALJ will have an opportunity to reconsider Ortega's mental impairments.

### VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **REVERSED and REMANDED** for proceedings consistent with this opinion.[5]

Dated: June 21, 2021

*/s/Kathleen B. Burke*
Kathleen B. Burke
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[5] This opinion should not be construed as a recommendation that, on remand, Ortega be found disabled.